BEESON v. CITY OF CHICAGO et al.

(Circuit Court, N. D. Illinois. June 29, 1896.)

1. STREET RAILWAY FRANCHISE—CONSENT OF ABUTTING OWNERS.
   After the consent of owners of property abutting on a street to the construction of an electric railway on the street had been obtained, it appeared that a part of such supposed street, distant from both ends of the railway, had never been dedicated or laid out as a street. *Held*, that there was no consent to the construction of the line on those parts of the supposed street which had been properly laid out and dedicated.

2. SAME.
   In Illinois a city has no power to give to a street railway the use of a street, unless a majority of the frontage of abutting owners consent thereto.

3. SAME.
   The fact that the city council has passed an ordinance permitting such use does not preclude inquiry as to whether the signatures to the consent were genuine.

4. SAME—INJUNCTION.
   An abutting owner may restrain by injunction the use of a street by an electric railway company under an ordinance which was invalid because passed without the consent of the abutting owners.

Mathews & Hughes and E. R. Bliss, for complainant.
Conklin & Grant, for defendants.

GROSSCUP, District Judge. This is a bill by Anne L. Beeson, a citizen of Michigan, against the city of Chicago, William D. Kent, commissioner of public works, and the General Electric Railway Company, a corporation organized under the laws of Illinois; all being, for the purposes of jurisdiction, citizens of Illinois. The bill shows that the complainant is owner in fee of certain described parcels of land within Chicago; that the General Electric Railway Company proposes to locate upon Fifth avenue, from Thirty-Seventh to Forty-Third streets, in Chicago, its tracks, for the purpose of operating the same as an electric street-railway system; that, with this in view,

the railway company presented to the Chicago city council petitions purporting to be signed by a majority of the owners of property abutting on such street between the streets named; that, by a subsequent petition, it appeared that the consent of one L. H. Beeson, acting for complainant's frontage, to such occupation by the street-railway company, had been obtained, and that the city council thereupon passed the ordinance giving to the railway company, its successors and assigns, permission and authority to lay down, construct, maintain, and operate such road; and that the commissioner of public works is about to issue a permit for said road. The bill further shows that a portion of the so-called Fifth avenue, to wit, from Thirty-Ninth street north to a point 333 feet south of Thirty-Seventh street, has never been in fact laid out, platted, or dedicated for the purposes of a street, but that the same is the private property of the complainant, and subject to no uses or easements as a street. The bill further shows that, while the consent of a majority of abutting frontage from Thirty-Seventh to Forty-Third streets purports to have been obtained in the consenting petition, so many signatures thereto, including the signature for complainant's land, are forgeries, that the petition does not in fact carry the consent of a majority of frontage of the abutting owners. These charges of forgery are explicitly set forth in accompanying affidavits, and not only are not denied by contrary affidavits, but were confessed upon the hearing. It was contended, however, that, if the complainant were entitled to an injunction for that portion of Fifth avenue not laid out as a street, she would not be entitled to an injunction in respect of the remaining portion of the street upon which other property abutted, for the reason that, laying out of view the unplatted portion of Fifth avenue, and regarding the balance as the portion of the street to which alone the petition was applicable, there was shown a genuine majority of consenting frontage. This view does not meet with my concurrence. The petition must be regarded as an entirety from Thirty-Seventh street to Forty-Third. On the basis of its being an entirety, the others' signatures may be presumed to have been obtained. The line, of which this petition covers but a portion, is a long one, running from a remote place to another remote place. The consenting owners, when they signed, had this fact in view. It would be intolerable to say that almost in front of their premises a block and a half could be dropped out of the proposed line, over which no cars would run, and yet the property owner be left without cause of complaint that the thing he consented to and the thing given are radically different.

The principal questions presented are: First, is the railway company entitled to lay its tracks under color of the city ordinance, notwithstanding the opposed wishes of a majority of the frontage within the space named? and, second, can the courts, at the instance of an abutting owner, interpose to prevent such action?

Municipal corporations are but limited agencies of the general legislative power that resides in the state. They have only such powers as are conferred upon them by the larger sovereignty known as the state. Among the powers specially conferred is the control over streets as trustees for the people of the state. This gen-

v.75ʀ.no.9—56

eral grant of power respecting the control of streets, in the absence of limitation, might possibly include the right to give over the streets to the uses of street railways. Street railways are necessarily associated in our minds with the use of streets. In the absence of anything to the contrary, therefore, such additional use would not seem extraordinary or strained. But this general grant of power to municipalities is limited by the act of 1887. That act withholds from municipal corporations the right to give up the streets to the uses of electric, cable, or other railways, unless a majority of the frontage of the abutting property owners have first consented. The legislative intent is therefore clearly manifested, that the use of streets for street railways, etc., is not within the ordinary uses, and not, therefore, within the general grant of control. Those decisions of other states, therefore, in which this limitation of power, in the general grant to municipalities, does not exist, is inapplicable to the situation here. In those states the general grant carries with it the right to give the additional use. In Illinois such right is expressly kept out of the general grant. In Illinois the total sum of power residing in the city over the subject-matter is this: The power to give the railway company the use of streets for their purposes in case a majority of the frontage have thereto consented, and in such case only. In the absence of such consenting frontage, there is no color of right in the municipality to grant the additional use. Now, if the city has no color of right to grant the use, can such use be restrained at the instance of an abutting property owner? The owner of abutting property has an interest in the street not common to all the people of the state, but personal and peculiar to himself. His property is affected in its commercial value, and in the possibilities and advantages of its use, by the character of the streets upon which it abuts. Such use of the street may destroy the availability of his land for purposes he has in mind, or has already put into execution. Even partially sentimental objections, such as the noise of electric cars, or the unsightliness of elevated structures, largely make up the actual elements of market value. Will any one contend that the abutting property owner, having such a peculiar and personal interest, may not protect it, in his own right, in a court of equity, against the intrusion of a usurper who comes on the street without color of law? Could a mill owner cut along these streets his canal to carry off the water that turns his wheels, or was otherwise used in the operation of his works? Would the property owner, seeing such extraordinary purpose, be compelled to stand helpless until the police interposed, or the attorney general took up his cause? The pretended grant of the city, but without color of law, for the extraordinary purposes of a street railway, is not so striking an instance of usurpation as is the illustration I have used, but it is different only in degree. Both the canal and the street railway are forbidden from the uses of the street, unless a majority of frontage consent. Their forced use, in the absence of such consent, is outside of the limits of even the color of law. The same consideration that gives to the owner a hearing in a court of equity as against the one demands for him a hearing as against the other. I am fully

alive to the consideration that where the municipality has a reasonable color of right to grant the additional use, and acts fairly under that color, it would be against public policy to permit every private individual incidentally affected to question such right in the courts. The law remits the initiative of remedies in such a case to the judgment of the whole people of the state, through their representative law officer. Such a case is the Patterson Case, 75 Ill. 588, and others in the same line, upon which much reliance has been placed. In each of these it was incontestable that the city's grant was under a colorable right, and was not wholly baseless in the law of the state.

Now, has the council, in the case under consideration, a reasonable color of right to vote this extraordinary use? Certainly not, if there were no petition at all. What is there in a forged petition that makes it one atom better than no petition at all? It is no petition, in contemplation of law. It is no petition in any sense, except in the criminal intentions it carries. There is therefore no more authority for the city's grant in this case than there would be for an unauthorized grant to excavate a canal, —no more authority than the mill owner himself, without an ordinance, would possess to excavate the canal. I do not overlook the contention that the council is the exclusive judge of the genuineness of the petition. But it is to me, at least, inconceivable that the legislature strictly limited the council's power to cases where there exists this condition of consent, and then made them the exclusive judges of the fact of such consent. The act was intended to restrain the municipality from giving up streets to uses to which the majority of the abutting owners was opposed, but such restraint is empty if the party restrained is the sole judge of the propriety of its exercise. The act was intended as security to the abutting property owners as against either the mistakes or injustice of the municipality, and, as such, was not left dependent for its enforcement upon the caprice of one of the parties to whom it applied. In this as in other cases where the city council oversteps its rights, and thereby trenches upon the property rights of the citizen, it is amenable to the ordinary process and determination of the courts. I have come to the foregoing conclusions after a careful study of the Illinois authorities, including the Patterson Case and Corcoran Case, 37 N. E. 68, and believe that my views will be found to be in accordance with those of the supreme court, when the question is fairly presented to that tribunal. I have disagreed from the Palmer Case in the appellate court for this district (60 Ill. App. 471), but am in harmony, in that disagreement, with the views of Judges Tuley and Horton, of the circuit bench, and Judge Shepard, of the appellate bench. A preliminary injunction may be entered in accordance with the prayer of the bill.